## In re AH PING.

*(Circuit Court, D. California. March 30, 1885.)*

1. CHINESE IMMIGRATION—MERCHANT TEMPORARILY ABSENT—RIGHT TO RETURN WITHOUT CERTIFICATE.

   The sixth section of the Chinese restriction act of 1882, as amended by the act of 1884, is not applicable to a Chinese merchant, one of a firm residing and doing their principal business in the United States, who temporarily departed therefrom before the passage of said act to attend to a branch of the said firm's business in British Columbia, and who returned to the United States after the passage of said act; and he may re-enter the United States without producing the certificate required thereby.

2. SAME—CONSTRUCTION OF RESTRICTION ACTS.

   Section 6 of the restriction act is not applicable to Chinese subjects, residents of the United States, who left the United States for foreign countries for temporary purposes, intending to return before the passage of the amendatory act of 1884, having a right to return at the time of their departure, and who did not return till after the passage of the act, nor to Chinese subjects, residents of the United States, departing for temporary purposes of business or pleasure since the passage of the act.

Appeal from District Court.

*Thos. D. Riordan*, for petitioner.

*S. G. Hilborn*, U. S. Atty., *contra*.

Before SAWYER and SABIN, JJ.

SAWYER, J. This is an appeal from the district court. The petitioner is a Chinese subject of the Mongolian race, a merchant, not a Chinese laborer, and a member of the old and well-known firm of Hop Sing & Co., doing a mercantile business in the city and county of San Francisco, of which firm he has been a member since 1877. He resided in the United States continuously for the period of eight years prior to his temporary visit to China. In 1879 he departed from California for the purpose of visiting China, and returned to the United States on November 30, 1881, before the passage of the original Chinese restriction act. He remained at San Francisco from the last-named date, attending to the business of his said firm, until February 1, 1882, when he departed for Victoria, British Columbia, to temporarily attend to the business of the firm, which has a branch house at that place. On July 19, 1884, after the passage of the Chinese restriction act, he departed from Victoria, and arrived at the port of San Francisco by sea July 23, 1884. He did not produce any certificate of the kind required by section six of the restriction act as amended in 1884, or as required by the act of 1882. The question upon this state of facts is whether said Ah Ping is entitled

to land, or whether the sixth section of the restriction act, as amended by the act of 1884, is applicable to a Chinese merchant, one of a firm residing and doing their principal business in the United States, who temporarily departed therefrom before the passage of said act to attend to a branch of the said firm's business in British Columbia, and who returned to the United States after the passage of said act. I have never had occasion before to consider this precise question. Although it may be possible, it would be impracticable, for the petitioner to go to China, and obtain the certificate required by that section; and if the provisions of the section are applicable, no other evidence is admissible. If section 6 is applicable, then the petitioner is not, otherwise he is, entitled to land.

The question at issue depends upon a construction of the clause of section 6: "*Every Chinese person,* other than a laborer, who may be entitled by said treaty or this act *to come* within the United States, and who shall be *about to come* to the United States," shall obtain the permission of and be identified as so entitled in the mode provided. This, with the clause in the same section making the certificate the sole evidence as to those to whom it is applicable, is the only provision, either in the treaties in force or the act, putting any limitation upon the right of a Chinese merchant to come and go of his own free will, without any limitation or legal obstruction. The only equivocal words in the clause, taken literally, would seem to be, "who shall be about to come to the United States." Does this phrase mean persons residing or domiciled abroad who leave their residence or domicile "to come to the United States" either for travel or pleasure, or to take up their residence here, or for other purposes? or does it also include Chinese subjects already domiciled in the United States, having their residence and business here, and who left the country temporarily before, or who shall leave it after, the passage of the act, for temporary purposes, with the intention of returning after the accomplishment of such purposes to their residence in the United States? We are satisfied, upon the rules of construction and principles established by the supreme court of the United States in *Chew Heong* v. *U. S.* 5 Sup. Ct. Rep. 255, that this provision should be so construed as not to embrace the latter class. To give the section any other construction would be to bring the act into direct conflict with the treaty, which the supreme court says should not be done if such a construction can be avoided. The object of the act is, undoubtedly, to prevent the increase in this country of the number of Chinese laborers, and this provision is designed to furnish means for readily identifying parties entitled to enter the United States. As to those domiciled in foreign countries, there is no ready means in this country for their identification. In the countries whence they propose to come, the means of ascertaining the facts are at hand; hence the provision. As to those resident or domiciled in this country, we have ourselves the best means of identifi-

cation; while as to many of them, even in their native country, and much less when they are temporarily in other foreign countries, there is no practicable means of either identification or for procuring the certificate prescribed.

The United States statutes do not now, nor have they ever, required or provided for the issue of any certificate in this country to resident Chinese, other than laborers, who are about to depart temporarily, for business or pleasure, either to China or other foreign countries. There are many Chinese merchants in California who have been domiciled in the state from 2( to 35 years. Our own means of identification of such persons are greatly superior to those of any other country, even that of their nativity. To require such parties, every time they go to another country, to perform the required acts abroad, would be utterly impracticable, and practically tantamount to an absolute refusal to permit their return.

The treaty between the United States and China of 1868, commonly called the "Burlingame treaty," guaranties to Chinese subjects the right, without any conditions or restrictions, to come, remain in, and leave the United States, and to enjoy all the privileges, immunities, and exemptions enjoyed by the citizens and subjects of the most favored nation. 16 St. 740. The treaty of November 17, 1880, puts no limitation upon this right, and does not authorize, expressly or by implication, any legislation of congress putting any limitation upon the rights of Chinese, other than "Chinese laborers." The language of the treaty is, "The limitation or suspension shall be reasonable, and shall apply *only* to Chinese who may *go* to the *United States as laborers, other classes not being included in the limitations.*" 22 Rev. St. 826. On the contrary, articles 2 and 3 of the latest treaty in express terms guaranties that all Chinese of any class, "now either permanently or temporarily residing in the territory of the United States, shall be secured the same rights, privileges, immunities, and exemptions as are enjoyed by the citizens or subjects of the most favored nation, and to which they are entitled by the treaty." There is nothing, therefore, in any of the treaties, that, expressly or by implication, authorizes congress to put any restriction upon the right to come and go of such parties, while in other respects they are expressly placed upon the footing of all other most favored foreigners. If, then, there is anything in the restriction act that puts a limit upon those rights, such limitation is a direct violation of the express provisions of the several treaties with China now in force. While such a provision in an act of congress would, undoubtedly, repeal the conflicting provisions of the treaties, as we have always heretofore held, yet, under the late decision of the supreme court, courts should, if possible, so construe the act of congress as not to bring it into conflict with treaty stipulations. Upon the principles established in the case cited, we are satisfied that the act can be fairly construed so as not to include this case. Section 1 provides in explicit terms, the

literal meaning of which cannot well be misunderstood, that "during such suspension it shall not be lawful for *any Chinese* laborer *to come* from any foreign port or place, or, having so come, to remain in the United States." And section 2 makes it an offense for the master of any vessel to "knowingly bring within the United States on such vessel, and land or attempt to land, or permit to be landed, *any Chinese laborer* from any foreign port or place." This language, without the limitation put upon it by the provisions of section 3, that it shall not apply to persons within the United States at the date of the treaty, is as broad and specific as it is possible to be, and, literally construed, includes every individual laborer of the Chinese race. Yet the supreme court, after quoting those provisions of sections 1 and 2, explicitly say, in substance, that if they had *stood alone, without the limiting clause of section 3*, its construction of the act would be the same as it is now. The exact language of the court, speaking through Mr. Justice HARLAN, is:

"*If these sections constituted the entire legislation in reference to the coming to this country of Chinese laborers, the court, under the established rules for the interpretation of statutes, would hold that they did not apply to Chinese laborers who by their residence in the United States, at the date of the last treaty, had acquired the right to go and come of their own free will, and to enjoy such privileges, immunities, and exemptions as were accorded here to citizens and subjects of the most favored nation.* For since the purpose avowed in the act was to faithfully execute the treaty, any interpretation of its provisions would be rejected which imputes to congress an intention to disregard the plighted faith of the government; and consequently the court ought, if possible, to adopt that construction which recognized and saved rights secured by the treaty. The utmost that could be said in the case supposed would be that there was an apparent conflict between the mere words of the statute and the treaty, and that by implication the latter, so far as the people and the courts of this country were concerned, was abrogated in respect of that class of Chinese laborers to whom was secured the right to go and come at pleasure." 5 Sup. Ct. Rep. 259.

This language, it is true, goes further than was absolutely necessary under the facts of that case; but it is the deliberate statement that the court would have so held, had the facts required it. Such a deliberate announcement, made under the circumstances of the case, we cannot regard as a mere *dictum*, or the expression of the individual opinion of the judge delivering the judgment. We look upon it as binding upon this court as a rule of decision. The court simply apply the universally recognized rule that the repeal of a statute or treaty by implication is not favored. In this case the clause of section six, under consideration, is less specific, as the words, "who shall be about to come into the United States," are more ambiguous, and are fairly open to the construction upon the language itself, in view of the surrounding circumstances, that they are only applicable to those coming for the first time, or to persons, having no present domicile or residence in the United States, but having their actual residence or domicile in a foreign country, about to come into the United States

either on business, for travel, or as temporary or permanent residents.

At the time the petitioner left his residence in San Francisco for British Columbia, on the business of his firm, both under the treaties and under the laws of the United States then in force, he had a legal right to return without any conditions or restrictions not applicable to subjects of any other or "the most favored nation." He had no reason to anticipate any change of the law. At his departure he had a vested right under the treaties and laws then in full force to return. He had a right to rely on the laws as they then were. If, by the act in question, it was intended to cut off this right of return, then it was the deliberate intention of congress to violate the treaty, and cut off a right vested in the petitioner both by the treaties and other laws of the land. As we have seen, the act must, if possible, be so construed as not to work this wrong. The supreme court, in support of the construction given to the act in the case cited, further observes:

"To these [reasons] may be added the further one that courts uniformly refuse to give to statutes a retrospective operation whereby rights previously vested are injuriously affected, unless compelled to do so by language so clear and positive as to leave no room to doubt that such was the intention of the legislature."

To give the construction insisted on by the United States attorney would be to give the act a retrospective operation which would injuriously affect the right of the petitioner to return, vested under the treaties and laws in force at the time of his departure, for temporary purposes, to British Columbia. And, as we have seen, there is less ground for holding that the petitioner is included within the purview of the act than in the case decided by the supreme court, upon the hypothesis assumed in the paragraphs quoted from the decision.

The following language of the supreme court, in *Chew Heong's Case*, is equally applicable to the petitioner in this case:

"It is also said, in support of the judgment, that the sixth section is significant, in that it prescribes the mode for the coming to this country of Chinese persons, 'other than a laborer, who may be entitled by said treaty and this act to come within the United States,' *but fails to provide the means for the return and identification of Chinese laborers who were entitled by the treaty to return, but who were out of the country when the act of congress was passed.* But this argument, like the one just alluded to, *only proves that congress, while making provisions for the coming of persons who were entitled to come, other than laborers, omitted to make special provision in reference to the latter, and consequently left them to stand upon their rights as secured by the treaty, and, if their right to enter the United States was questioned, to prove in some way consistent with the general principles of law that they belonged to the class entitled to go and come.*" 5 Sup. Ct. Rep. 266.

With as good reason may it be said that congress, while providing for the case of Chinese, other than laborers, domiciled in foreign countries, not residents of the United States, and having no vested right to return as present residents of the United States, temporarily absent on business or pleasure, "who shall be about to come to the United States," "omitted to make any special provision in reference

to" Chinese residents of the United States temporarily absent, with a right to return, at the date of the passage of the act, or who, after the passage of the act, temporarily leave the United States for foreign countries on business or pleasure; "and consequently left them to stand upon their rights as secured by the treaty; and, if their right to enter the United States was questioned, to prove, in some way consistent with the general principles of law, that they belonged to the class entitled to go and come."

If we have interpreted the principles established by the supreme court aright, the result is that section 6 of the restriction act is not applicable to Chinese subjects, residents of the United States, who left the United States for foreign countries for temporary purposes, intending to return, before the passage of the amendatory restriction act,—having a right to return at the time of their departure,—and who did not return till after the passage of the act; nor to Chinese subjects, residents of the United States, departing for temporary purposes of business or pleasure since the passage of the act. This is the construction acted upon by the executive department of the government, and, we think, is fully justified in these particulars by the decision of the supreme court.

It results that the judgment of the district court must be reversed, and the petitioner discharged. It is but just to say that the judgment of the district court was rendered before the receipt here of the decision of the supreme court in *Chew Heong's Case*. If there are any expressions in any of my former opinions apparently inconsistent with the views here adopted, they are in opinions rendered before the decision of the supreme court in the case cited, and they had special reference to the facts in the case decided, and no reference to the point now involved.

Let the judgment of the district court be reversed, and the petitioner discharged.